## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| **MARTHA SANDEFUR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **NO. 3:15-cv-552** |
| **v.** | ) | **JUDGE CRENSHAW** |
| | ) | |
| | ) | |
| **YATES SERVICES, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Martha Sandefur filed this action against Yates Services, LLC ("Yates"), alleging that it terminated her employment in retaliation for her filing a workers' compensation claim, in violation of Tennessee's common law. Before the Court is Yates's motion for summary judgment. (Doc. No. 22.) Sandefur is unable to prove causation, which is a required element for a *prima facie* case of retaliatory discharge under Tennessee law. Even if Sandefur were able to prove causation, she cannot prove that Yates's legitimate non-retaliatory reason for terminating her—her refusal to return to work after medically cleared to do so—was pretextual. Accordingly, the Court **GRANTS** Yates's motion for summary judgment.

## I. Factual and Procedural History

Yates supplies personnel to the automobile plants in Smyrna and Dechert, Tennessee that are operated by Nissan Motor Company Ltd. ("Nissan"). (Doc. No. 24 at 1.)[1] In July 2013, Yates

---

[1] In Docket Number 27, Sandefur admits to all of Defendant's Statements of Undisputed Material Facts listed in Docket Number 24. As Sandefur's response does not "reproduce[] the facts and citations verbatim as set forth by the movant" as required by Local Rule 56.01(c), the Court refers to the Defendant's filing at Docket Number 24, which has the full text of each statement of fact admitted by Sandefur.

hired Sandefur to work at Nissan's Smyrna plant, where she built a certain car part. (Id. at 2.) Sandefur's supervisor at the plant was Mike Durbin. (Id.) On February 22, 2014, Sandefur suffered an on-the-job injury to her right shoulder. (Id.) She told Durbin about it the same night, and he asked her if she wanted to see an on-site medical provider. (Id.) She initially declined, but later in the night, when he asked her again, she agreed. (Id. at 3.) The on-site medical provider, Comprehensive Health Services ("Comprehensive Health"), examined Sandefur and told her not to use her right arm for the remainder of the shift. (Id.) Upon her return to work, Durbin assigned Sandefur a task that only required use of her left hand for the remainder of her shift. (Id.) Yates treated Sandefur's injury as a worker's compensation injury. (Id.)

On February 24, 2014, Sandefur returned to work. Comprehensive Health examined her again and imposed restrictions on the use of her arm, such as restricting the amount of weight that she could lift, push or pull and instructing her to keep her elbow at her waist. (Id. at 3-4.) From February 24-28, 2014, Durbin assigned Sandefur to the metal finish department, where she was able to work within the imposed restrictions. (Id. at 4.)

On March 1, 2014, Comprehensive Health examined Sandefur again, and she stated that she was doing better. (Id.) Comprehensive Health relaxed the restrictions on the use of her arm, allowing her to lift, push, and pull more weight and to occasionally work overhead with her right arm. (Id.) On March 1-7, 2014, Durbin placed Sandefur in a variety of positions. (Id. at 4-5.)

The work Sandefur performed on March 5-7, 2014, although compliant with the imposed restrictions, nonetheless caused her pain. (Id. at 5.) As a result, on March 7, 2014, Sandefur went back to Comprehensive Health for another examination. (Id.) Comprehensive Health advised Sandefur not to use her arm for the remainder of her shift. (Id. at 6.) Durbin assigned her to a task that involved "very limited" work. (Id.) On March 10-14, 2014, Sandefur worked in the metal

finish line department. (Id.) On March 13, 2014, Sandefur went to Comprehensive Health for another follow-up visit, and Comprehensive Health imposed another set of restrictions for the use of her arm. (Id.)

On March 20, 2014, a physician with Comprehensive Health examined Sandefur and informed her that he thought she needed surgery on her right arm but wanted to send her for a magnetic resonance imaging ("MRI") to confirm that surgery was needed. (Id.) He imposed another set of restrictions for the use of her arm and gave her a cortisone shot. (Id. at 7.) Sandefur did paperwork for the remainder of her shift on March 20 and on March 21, 2014. (Id.) For the week of March 24-28, 2014, Sandefur was assigned to tasks that were consistent with her restrictions. (Id. at 7-8.)

Yates provided Sandefur with a panel of physicians to choose from for treatment of her work-related injury, as required by Tennessee's worker's compensation law. (Id. at 7.) Sandefur selected Dr. Robert Greenberg with the Tennessee Orthopedic Alliance. (Id.) On March 28, 2014, Dr. Greenberg examined Sandefur for the first time and scheduled the MRI for her right shoulder. (Id. at 8.) From March 31, 2014, through the remainder of her active employment with Yates, Sandefur worked in the metal finish line department, which involved tasks consistent with her restrictions. (Id.) On April 8, 2014, she had an MRI on her right shoulder, which confirmed that she had a torn rotator cuff. (Id.)

On May 7, 2014, Sandefur had surgery to repair her torn rotator cuff. (Id.) Between the time of her injury on February 22, 2014, and her surgery on May 7, 2014, the only job assignment that caused Sandefur to be in pain was the work she performed on March 5-7, 2014. (Id. at 9.) The healthcare she received for her shoulder was at no cost to her, as all out-of-pocket expenses were

covered by Yates' workers' compensation insurance. (Id.) On May 9, 2014, Sandefur called Durbin to inform him that the surgery went well. However, she never returned to work. (Id.)

On May 19, 2014, Dr. Greenberg with the Tennessee Orthopedic Alliance examined Sandefur, and stated that she could return to limited duty work. (Id. at 10.) He indicated that her only restriction was to not use her injured arm, which was in a sling at the time. (Id.) Before surgery, Sandefur had been restricted from working with her injured arm, and Yates had assigned her work that was consistent with that restriction. (Id.)

On May 20, 2014, Shirley Chessor, a nurse for Yates's workers' compensation carrier Travelers Insurance, e-mailed Dr. Greenberg's May 19, 2014 report to Yates's Safety Manager Gerald Shaw and Yates's workers' compensation nurse Melissa Harrell, asking whether Yates could accommodate Sandefur's restrictions. (Id. at 11.) Nurse Chessor's job includes following up with Yates about whether it is able to return employees with medical restrictions to work and staying in contact with physicians treating Yates's employees who have workers' compensation claims. (Id.) Later that day, Durbin e-mailed Nurse Harrell and asked her to contact Sandefur and "have her report back to work as we do have several jobs that can be performed since she has been released back to work." (Id.)

After receiving this e-mail, Nurse Harrell tried to call Sandefur to inform her that Yates had a position for her that complied with her restrictions and to request that she return to work. (Id. at 12.) Nurse Harrell did not reach Sandefur, but left her a message. (Id.) On May 27, 2014, Nurse Chessor e-mailed Shaw and Nurse Harrell to ask whether Durbin could accommodate Sandefur's work restrictions, even though Durbin had already e-mailed Nurse Harrell on May 20, 2014, requesting that she contact Sandefur and ask her to return to work, as he had positions that would be consistent with her restrictions. (Id.)

On June 2, 2014, Nurse Chessor and Sandefur spoke by telephone, and Nurse Chessor informed Sandefur that Yates had work available for her. (Id.) Sandefur responded that she could not comply with Yates's dress code because of the injury to her arm, could not drive because of her medication, and had no transportation to work. (Id.) That same day, Nurse Chessor e-mailed Nurse Harrell and Shaw, informed them that she had spoken with Sandefur and had told Sandefur that she was responsible to come to work because Yates was able to accommodate her restrictions. (Id. at 13.) Nurse Chessor also stated in the e-mail that she had told Sandefur that she would contact Dr. Greenberg to discuss Sandefur's pain medication issue and that Sandefur needed to contact Shaw. (Id.) Later on June 2, 2014, Dr. Greenberg's assistant e-mailed Nurse Chessor to inform her that Dr. Greenberg would give Sandefur a new medication for her work hours. (Id.)

On June 3, 2014, a claims professional with Travelers Insurance sent Sandefur a letter, which Sandefur admits she received. (Id.) The letter stated that Travelers Insurance had received notice that, despite Yates's offering Sandefur light duty work within her restrictions, Sandefur had refused to return to work and that, as a result, Travelers would be unable to issue any additional workers' compensation benefits to her as of May 21, 2014. (Id. at 14.) On June 5, 2014, Nurse Harrell e-mailed Durbin and stated that Sandefur had been told to report to work several times, had not yet called her, and that the insurance company would no longer pay Sandefur workers' compensation benefits because Yates had offered to accommodate her. (Id.)

On June 10, 2014, Nurse Harrell e-mailed Durbin to ask for an update on Sandefur's failure to return to work, stating that Travelers Insurance needed to know the status of Sandefur's employment. (Id.) Durbin responded that day and informed Nurse Harrell that Sandefur had not reported back to work. Later that day, Nurse Harrell spoke with Sandefur and told her that if she did not come to work the following day, she would be fired. (Id. at 15.) That prompted Sandefur

to call Durbin on the telephone and ask him what job she could do if she could not comply with Yates's dress code. (Id.) Durbin responded that he did not know, but Sandefur should show up for work and Yates would have something for her to do. (Id.) After speaking with Durbin, Sandefur called Nurse Harrell back. (Id.) Nurse Harrell told Sandefur that she had to report to work the next day if she wanted to keep her job, whether that meant driving with her left arm, having her mother drive her to work, or taking a cab to work. (Id.) Sandefur's mother had driven her to most of her twice-weekly physical therapy appointments in May and June 2014, to visit family members, and to the store. (Id.) Although Yates employed 6,153 employees at Nissan's Smyrna facility as of June 10, 2014, Sandefur did not ask any of her co-workers to give her a ride to work. (Id. at 16.) On June 11, 2014, Sandefur did not come to work, and Yates terminated her employment. (Id.) Sandefur's termination notice states that she was terminated for missing three days of work. (Doc. No. 35 at 2.) However, Sandefur does not dispute that she performed no work for Yates from the date Dr. Greenberg cleared her to return to light duty work on May 19, 2014 until the date Yates terminated her on June 11, 2014. (Doc. No. 24 at 10.)

On May 12, 2015, Sandefur filed a lawsuit in the Rutherford County Circuit Court, alleging that Yates fired her in retaliation for filing a workers' compensation claim, in violation of Tennessee state law. (Doc. No. 1-1- at 4-9.) That day, Yates removed to this Court on the basis of diversity jurisdiction. Sandefur is a resident of Tennessee. Yates is a single-member limited liability company, and the member is a Mississippi corporation with a principal place of business in Mississippi. The amount in controversy exceeds $75,000. 28 U.S.C. § 1332. (Doc. No. 1 at 2.)

## II.     Legal Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Pennington v.

State Farm Mut. Automobile Ins. Co., 553 F.3d 447, 450 (6th Cir. 2009). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating 'an absence of evidence to support the nonmoving party's case.'" Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If the moving party is able to meet this initial burden, the non-moving party must then "set forth the specific facts showing that there is a genuine issue for trial." Id. (quoting Fed. R. Civ. P. 56(e)).

## III. Legal Analysis

Sandefur alleges that Yates fired her in retaliation for filing a workers' compensation claim. Yates argues in its motion for summary judgment that Sandefur cannot establish a *prima facie* case of retaliatory discharge and that, even if she could, she cannot rebut its legitimate, non-retaliatory reason for discharging her.

### A. Retaliatory Discharge Claim

In Tennessee, an employer may not lawfully discharge an employee for filing a workers' compensation claim. Yardley v. Hosp. Housekeeping Sys., LLC, 470 S.W.3d 800, 804 (Tenn. 2015). An employee who believes that her employer has fired her for filing a workers' compensation claim may bring a claim for retaliatory discharge. Id. Under Tennessee law, the elements of a common law *prima facie* case for a workers' compensation retaliatory discharge claim are: "(1) the plaintiff was an employee of the defendant at the time of the injury; (2) the plaintiff made a claim against the defendant for workers' compensation benefits; (3) the defendant terminated the plaintiff's employment; and (4) the claim for workers' compensation benefits was

a substantial factor in the employer's motivation to terminate the employee's employment." Id. at 805; Anderson v. Standard Register Co., 857 S.W.2d 555, 558 (Tenn.1993). "The burden of proof rests upon the plaintiff to prove the elements of the cause of action, including the causal relationship between the claim for workers' compensation benefits and the termination for employment." Frizzell v. Mohawk Indus., No. M200401598COAR3CV, 2006 WL 1328773, at *3 (Tenn. Ct. App. May 15, 2006) (citing Anderson, 857 S.W.2d at 558). "Proof of discharge without evidence of a causal relationship between the claim and discharge does not present an issue for the jury on a claim of retaliatory discharge for the filing of a workers' compensation claim." Id. (citing Anderson, 857 S.W.2d at 558).

Yates concedes, for purposes of its motion for summary judgment, that Sandefur can establish the first three elements of a *prima facie* case, but argues that she cannot establish the fourth. (Doc. No. 23 at 9.) If a plaintiff has only circumstantial evidence to prove the fourth element, "the employee must present direct and compelling circumstantial evidence." Newcomb v. Kohler Co., 222 S.W.3d 368, 391 (Tenn. Ct. App. 2006). The forms of circumstantial proof upon which a plaintiff can rely to prove retaliatory discharge, include the following:

> the employer's knowledge of the compensation claim, the expression of a negative attitude by the employer toward an employee's injury, the employer's failure to adhere to established company policy, discriminatory treatment when compared to similarly situated employees, sudden and marked changes in an employee's performance evaluations after a workers' compensation claim, or evidence tending to show that the stated reason for discharge was false.

Id.

Sandefur has failed to make a *prima facie* case that her claim for workers' compensation was a substantial factor in Yates's motivation to terminate her. First, Sandefur's subjective beliefs and speculations are insufficient to create the "requisite causal relationship." Newcomb v. Kohler Co., 222 S.W.3d 368, 391 (Tenn. Ct. App. 2006); Reed v. Alamo Rent-A-Car, Inc., 4 S.W.3d 677,

685 (Tenn. Ct. App. 1999). Sandefur testified that her "personal impression[]" was that, "once I hurt my arm and I was never going to be able to do the job that I was hired to do, they didn't need me anymore. They didn't want me there anymore." (Doc. No. 22-1 at Page ID# 151.) Not only are Sandefur's speculations insufficient to prove causation, but she speculates as to a causal link between her *injury* and her termination, rather than her *workers' compensation claim*. As Tennessee courts have held, "a plaintiff may not prevail on a wrongful discharge claim merely by showing that a causal connection exists between her on-the-job injury and her subsequent discharge. Instead, the plaintiff must show that her claim for workers' compensation benefits, as opposed to her injury, was the true or substantial reason for her discharge." Reed v. Alamo Rent-A-Car, Inc., 4 S.W.3d 677, 685 (Tenn. Ct. App. 1999). Furthermore, when asked why she believes Yates terminated her employment, she responded, "I believe it is because I didn't go back." (Doc. No. 22-1 at Page ID# 151.) The evidence in this case supports her own non-retaliatory explanation for her discharge.

Second, the Court is unpersuaded by Sandefur's argument that Yates failed to terminate her in compliance with the employee handbook, which constitutes evidence of retaliatory intent. In particular, Sandefur argues that the employee handbook entitled her to a written reminder after two consecutive unapproved absences. (Doc. No. 29 at 5) (citing Handbook, Doc. No. 29-3 at 14). However, the same page of the handbook cited by Sandefur also states the following:

> While corrective action in most circumstances is progressive, Yates reserves the right to discipline any employee without prior progressive corrective action. In this regard, it is important to realize that, [if] in the opinion of Yates, performance problems or unacceptable conduct is too serious for the progressive steps, then Yates may deviate from any of the progressive steps and impose the discipline determined by Yates to be appropriate.

(Doc. No. 29-3 at 14.) Thus, Yates did not violates the employee handbook, as it allows for deviation from the progressive corrective action guidelines. Yates's decision that Sandefur's

refusal to return to work for three weeks after the doctor had cleared her to return to work and after several individuals had informed her of the need to return to work was worthy of immediate termination does not suggest retaliatory intent. Sandefur also complains that Yates asked her to return to work even though she could not comply with the dress code required by the employee handbook. Yet Durbin explicitly told her to come to work even if she was not in dress code and that Yates would find something for her to do.

Third, the Court is also unpersuaded by Sandefur's argument that the evidence showing that Yates terminated 77 employees who had previously filed workers' compensation claims in the past five years establishes a pattern of conduct that, when viewed in combination with the failure to comply with the employee handbook, constitutes proof of retaliatory intent. (Doc. No. 29 at 2.) The mere fact that Yates terminated 77 workers at some point in time after those workers filed workers' compensation claims is insufficient to prove a causal connection. <u>Cooper v. Wyndham Vacation Resorts, Inc.</u>, 570 F.Supp.2d 981, 985 (M.D. Tenn.2008). Indeed, Sandefur has not proven Yates's retaliatory motive as to even one of these 77 employees. Furthermore, as Sandefur admits, Yates employed 6,153 employees at the Smyrna facility where she worked. In response to Sandefur's use of this statistic, Yates has offered proof that in just the 12-month period from July 1, 2013, through June 30, 2014, roughly the time period when Sandefur worked for Yates, approximately 477 Yates employees reported work-related injuries and either remain employed with Yates, were subsequently hired directly by Nissan, or left Yates voluntarily at some point prior to April 1, 2016. (Docket Nos. 32-34.)

Fourth, Yates made repeated efforts to get Sandefur to return to work. "Courts have found that evidence of a defendant's willingness to have the plaintiff return to work serves to undercut an argument for retaliatory intent." <u>Cooper v. Wyndham Vacation Resorts, Inc.</u>, 570 F. Supp. 2d

981, 987-88 (M.D. Tenn. 2008). "An employer who intended to retaliate against an employee for filing a workers' compensation claim presumably would not invite that employee back to work." Id. at 988. Yates did not request that Sandefur return to work before Dr. Greenburg examined her and released her to perform light-duty work. Upon learning that Sandefur had concerns about working while taking her prescribed pain medications, Yates's nurse contacted the doctor to ask if he could prescribe a different medication for work hours. Sandefur states that the doctor did not inform her that the new medication would be more suitable for working hours, but that does not change the fact that the Yates's efforts to remove obstacles to her returning to work cuts against her claim that it wished to terminate her in retaliation for her filing a workers' compensation claim. See Johnson v. St. Francis Hosp., Inc., 759 S.W.2d 925, 928 (Tenn. Ct. App. 1988) (finding that employer's making inquiry with plaintiff's doctor to see if and when plaintiff could return to work "persuasive evidence to negate any motive for retaliation against the plaintiff.").

In addition, although Sandefur takes issue with the fact that Yates did not put its requests for her to return to work in writing, she does not dispute that she received several communications from various individuals requesting that she return to work, and reassuring her that Yates would find work consistent with her restrictions, as it had done in the past. Yates's nurse—Nurse Harrell—left Sandefur a voicemail on May 19, 2014, in an effort to ask her to return to work, as Yates had several jobs that she could do. (Doc. No. 24 at 12.) Sandefur admits that on June 2, 2014, Travelers Insurance's nurse—Nurse Chessor—spoke with her and told her that Yates had work available for her. (Id.) Sandefur also admits that she received a letter sent on June 3, 2014, by a claims professional with Travelers Insurance notifying her that, because Travelers had received notice that she had been offered light-duty work within her restrictions but had refused to

return to work, it would no longer issue her workers' compensation benefits. (Id. at 13-14.) Last, Sandefur admits that on June 10, 2014, Nurse Harrell told her on the telephone that if she did not come into work the following day, she would be fired. (Id. at 15.) Sandefur concedes that she then called Durbin to ask what job she could do when she could not comply with the dress code and that Durban responded that she should show up for work and Yates would have something for her to do. (Id.)

The Court is unpersuaded by Sandefur's protest that, if Yates really wanted her to come to work, it would have given her more notice than the June 10, 2014 phone call and would have excused her absence at work based on her concerns about medications, transportation, and dress code. Even assuming Yates was legally obligated to take into consideration Sandefur's concerns about medications in requiring her to return to work, the record does not demonstrate that Sandefur discussed with Yates any concerns about medications after Yates contacted her doctor to get a new medication prescribed for work hours. See Reed v. Alamo Rent-A-Car, Inc., 4 S.W.3d 677, 685 (Tenn. Ct. App. 1999) ("[A]bsent evidence of a discriminatory motive, a plaintiff may not satisfy the causation requirement merely by showing that her employer required her to return to work over her objection that she was medically unable to work."). Sandefur's issues with transportation were certainly not a legally-protected justification for her to refusal to return to work. As to Sandefur's concern about her lack of compliance with the dress code, Durbin told her to come even if she were not dressed in compliance with the dress code. The record demonstrates that Yates made more effort to address Sandefur's concerns than it was legally required to do.

As Sandefur has failed to present evidence of causation, the Court grants Yates's motion for summary judgment on the retaliatory discharge claim.

## B.  Legitimate, Non-Pretextual Reason

Even if Sandefur could establish a *prima facie* case of retaliatory discharge, she is unable to dispute Yates's legitimate, non-pretextual, non-retaliatory reasons for her termination—namely that she refused to return to work for three weeks after she was medically cleared to return and even when assured that Yates would assign her to tasks consistent with her restrictions. "[P]roof of a causal link between the claim for benefits and the employee's discharge imposes upon the employer the burden of showing a legitimate, non-pretextual reason for the employee's discharge." Anderson v. Standard Register Co., 857 S.W.2d 555, 559 (Tenn. 1993). The Anderson court articulated the employer's burden as follows:

> Once the employee has made a *prima facie* case of retaliation, the burden devolves upon the employer of proving a legitimate nonpretextual nonretaliatory reason for the discharge. The reason may involve the employee's own shortcomings, such as unexplained tardiness, excessive absenteeism, lying as to previous compensation claims, or physical inability to do the job....
>
> The legitimate nonpretextual reason may also be one not related to this particular employee, but stemming from general business conditions, particularly as evidenced by the fact that there were general layoffs involving, of course, other employees in no way involved in any retaliation.

Id. (quoting 2A A. Larson, The Law of Workmen's Compensation, § 68.36(d), pp. 188–191 (1990)).

"If the employer presents a non-pretextual reason for the employment action, the burden shifts back to the employee to prove the employer's explanation is pretextual. In so doing, the employee must present specific admissible facts, which realistically challenge the defendant's stated reasons." Frizzell v. Mohawk Indus., No. M200401598COAR3CV, 2006 WL 1328773, at *3 (Tenn. Ct. App. May 15, 2006); Hall v. Wal-Mart Stores E., LP., 637 F. Supp. 2d 588, 600 (M.D. Tenn. 2009). "The plaintiff may challenge the stated reason and thereby create a question

of fact as to a pretextual defense by showing the employer's reasons 'have no basis in fact, or if they have a basis in fact, by showing that they were not really factors motivating the discharge, or if they were factors, by showing that they were jointly insufficient to motivate the discharge.'" Frizzell, 2006 WL 1328773 at *3 (quoting Moore v. Nashville Elec. Power Bd., 72 S.W.3d 643, 652 (Tenn. Ct. App. 2001)). "The employee, however, faces summary dismissal of his claim if he is unable to demonstrate that he could prove the employer's reason for the discharge was pretextual." Id.

The Plaintiff has not proven that Yates's stated reason for terminating her has no basis in fact, was not really the factor motivating the discharge, or that, if it was a factor, was insufficient to motivate the discharge. Thus, she has failed to demonstrate that she could prove that Yates's reason for the discharge was pretextual. As a result, the Court will grant Yates's motion for summary judgment.

**IV. Conclusion**

For the foregoing reasons, the Court **GRANTS** Yates's motion for summary judgment. (Doc. No. 22.)

The Court will file an appropriate accompanying order.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE